UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JOHN W. SMIRK,<br><br>    Plaintiff<br><br>v.<br><br>TRUSTEES OF THE INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION PLAN, et al.,<br><br>    Defendants | Case No.: 2:19-cv-00650-APG-VCF<br><br>**Order Granting Judgment in Favor of Defendants** |

    Plaintiff John W. Smirk seeks reversal of a decision by defendant Trustees of the International Painters and Allied Trades Industry Pension Plan (Trustees) to recoup pension benefits that were paid to him.  Smirk retired and applied for and received early retirement benefits but continued serving as Business Manager-Secretary-Treasurer (BMST) for the local union.  Smirk believed he was allowed to serve as BMST and collect retirement benefits under waivers that the Trustees had approved.  After 22 months of receiving benefits, Smirk was told that his work as BMST disqualified him from pension benefits.  The Trustees ruled that Smirk never retired and that the waivers did not apply to him, so Smirk had to repay the benefits.

    Smirk contends that the Trustees abused their discretion by retroactively deciding he did not retire and interpreting the waivers to exclude his position as BMST.  He also argues that the Trustees waived their right to recoup the benefits, or that they should be estopped from doing so.  The Trustees respond that Smirk's application was mistakenly approved and that, upon realizing the error, they reasonably interpreted the retirement plan and waivers to not include him.

    Both parties have agreed this case should be decided on the administrative record and the briefs.  I grant judgment in the defendants' favor.  The Trustees did not abuse their discretion in

seeking to recoup the overpayment of pension benefits because they reasonably determined that Smirk never retired. Waiver and estoppel do not apply because it would enlarge Smirk's entitlement to benefits beyond what is permitted under the plan.

**FACTS**

The International Painters and Allied Trades Industry Pension Plan (Plan) is administered pursuant to the Employee Retirement Income Security Act (ERISA) and overseen by the Trustees who serve as the plan administrator and named fiduciary. ECF No. 33 at 9, 12. The Trustees are granted "full discretion and authority to determine all questions of fact or law arising in the administration, interpretation and application of the Plan." *Id.* at 12. Under the Plan, vested participants may receive benefits when they retire. *See generally id.* The Plan defines "retired" as "a separation from Industry Service that is expected to be permanent and, except as excused by the Plan or applicable law, the filing of an application for benefits with the Plan." *Id.* at 111.

Participants will not be "considered retired," or will have their benefits suspended, when they engage in suspendible work, such as employment with "any labor organization." *Id.* at 55. If benefits were paid out to someone "later determined to be suspended," then the "overpayment shall be recoverable[.]" *Id.* at 56. The Trustees have broad discretion to waive the suspension of benefits rules. *Id.* at 61 (allowing the Trustees to "waive suspension of benefits subject to such limitations as the Trustees in their sole discretion may determine" and to create reasonable waiver rules that they, "in [their] sole and absolute discretion, may choose to impose").

Smirk has been a member of the International Union of Painters and Allied Trades (IUPAT) Local 2001 for more than 30 years and became a vested participant under the IUPAT Plan. ECF No. 34 at 5. In 2004, Smirk was elected as BMST for District Council 15 and has

2

been continuously re-elected to the position since then. ECF No. 31-2 at 49.  As BMST, Smirk undertook various tasks on behalf of District Council 15, including applying to the Trustees for waivers of the suspension of benefits rules. *See, e.g.*, *id.* at 20, 93, 103; ECF No. 31-3 at 51.  The waivers were meant to meet the "needs of the industry or marketplace" for "groups having skills in specific trades, or groups in specific geographic areas." ECF No. 31-3 at 90.

In January 2014, Smirk submitted a few waiver requests for District Council 15, including one for "[r]etirees performing representative consulting services within the jurisdiction of District Council 15 for the year 2014." *Id.* at 51.  These waivers were approved by the Trustees the following month. ECF No. 31-1 at 13, 83.  Smirk submitted that same waiver language in 2015, which was also approved. ECF No. 31-2 at 2; *see also* ECF No. 31-3 at 50 (rewording the approved waiver as "Retirees employed as consultants for District Council 15"). Smirk's 2016 waiver was approved as well. ECF No. 31-2 at 117 (including an "and" between "representative" and "consulting services" that was not present in the previous waivers).

On June 21, 2014, Smirk was re-elected as BMST. *Id.* at 140.  Six days later, he submitted his Pension Benefits Application to indicate his early retirement and to start receiving pension benefits. ECF No. 31-1 at 19.  On that application, he provided his last day of IUPAT Plan work under employer "DC 15" to be June 30, 2014. *Id.*  At some point after IUPAT received the document, someone made a handwritten, unsigned, and undated note across it reading "working under waiver DC15." *Id.*  Subsequent documents indicate that the note was made by an IUPAT pension analyst. ECF Nos. 30 at 16 (the Fund Administrator's timeline indicating that "Tangela" wrote it); 31-1 at 36 (containing "Pension Analyst: Tangela Thomas" on the bottom right corner of a letter approving Smirk's application).

On August 6, Smirk received a letter from the Fund Administrator, "[o]n behalf of the Board of Trustees," stating that his application was approved. ECF No. 31-1 at 36. In January, Smirk returned the IUPAT Pension Plan Payment Election Form, which listed his retirement date as "07/01/2014." *Id.* at 39. On February 6, 2015, the Fund Administrator, acting on the Trustees' behalf, congratulated him on his retirement and sent a check for his pension benefits. *Id.* at 89. Smirk continued to receive pension benefits for nearly two years. ECF No. 31-2 at 30.

Throughout this time, Smirk continued working as BMST. *Id.* His role included corresponding with the Fund Administrator and some of the Trustees to apply for various waivers for District 15. *See, e.g.*, ECF Nos. 31-3 at 50 (indicating approval of Smirk's 2015 waiver in an April 2015 letter from the Fund Administrator with courtesy copies to various Trustees); 31-2 at 90 (recommending approval of waivers sent by "Business Manager/Secretary-Treasurer John Smirk" in a 2016 memorandum from the General Vice President). Smirk still serves as BMST, as he was again re-elected in June 2018 for a four-year term. ECF No. 30 at 5.

On April 1, 2016, the IUPAT general counsel sent an email to the Fund Administrator telling her that Smirk's pension benefits should be stopped. He explained:

> Essentially he was not entitled to a waiver since he is still working as an elected officer. The Fund office will need to prepare a suspension letter. We should discuss the procedure when the staff approves pensions for local officers.

ECF No. 31-2 at 21. On April 15, the Fund Administrator told Smirk that his benefits would be suspended, explaining that he was "engaged in suspendible work" because he was "engaged in full time employment" as the BMST. *Id.* at 30. The letter explained that the Pension Fund would be able to recover any benefits paid to him while he had engaged in suspendible work. *Id.* Smirk subsequently appealed this determination, arguing that the BMST position fell under the

4

approved waivers of suspension of benefits rules because he was "employed" for District Council 15 and was "clearly continuing to perform representative work." *Id.* at 50.

The Trustees denied Smirk's appeal. *Id.* at 113-16. They explained that Smirk was an employee rather than a consultant under the waiver, and that any ambiguities in the waiver should be construed against Smirk because he was the one who submitted the waivers. *Id.* at 114-15. In addition, the Trustees concluded that Smirk did not have an initial right to benefits because he never stopped working and therefore never "retired." *Id.* at 115. They supported this with language from an IRS Private Ruling Letter that determined a person is not "legitimately retired" if there is "reasonable certainty" that the employee would continue to perform services for the employer. *Id.* (quoting I.R.S. P.L.R. 201147038, at 6 (Apr. 20, 2010)).

Following this determination, the Fund Administrator wrote to Smirk that he owed $152,377.67 from the overpayment plus interest, and explained the ways Smirk could pay it back. *Id.* at 118. Smirk again appealed this determination with similar arguments he made before but added that he believed he was singled out for the recoupment of pension benefits. *Id.* at 140; ECF No. 31-4 at 17. The Trustees again denied his appeal, explaining that: "The Fund Office evaluated all overpayments for recovery." ECF No. 31-4 at 17.

Smirk brings this suit under 29 U.S.C. § 1132(a)(1)(B), which allows an ERISA plan participant to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" He argues that the Trustees abused their discretion by seeking to recover the pension benefits after paying them to him for 22 months, all while knowing that he was the BMST. Smirk contends that the Trustees waived their right to recoup the benefits, or that they should be estopped from recovering them. The Trustees respond that their decision was reasonably based on the language

of the waivers and the Plan. They also contend that waiver and estoppel do not apply in abuse of discretion cases.

**STANDARD OF REVIEW**

When a pension plan gives trustees discretion to interpret plan provisions, the trustees' decisions are reviewed for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108, 111 (1989); *Lehman v. Nelson*, 862 F.3d 1203, 1216 (9th Cir. 2017). Here, the Plan grants the Trustees "full discretion and authority to determine all questions of fact or law arising in the administration, interpretation and application of the Plan," as well as broad authority to issue suspension of benefits waivers. ECF No. 33 at 12, 61. Both parties agree this language means that I should review the Trustees' decision for abuse of discretion. ECF Nos. 30 at 11; 34 at 10.[1]

Under the abuse of discretion standard, the Trustees' decisions "will not be disturbed if reasonable." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011) (quoting *Conkright v. Frommert*, 559 U.S. 506, 521 (2010)). Trustees abuse their discretion when they "construe provisions of [a] plan in a way that clearly conflicts with the plain language of the [p]lan, render[s] nugatory other provisions of the [p]lan, or lacks any rational nexus to the primary purpose of the [p]lan." *Tapley v. Locals 302 & 612 of Int'l Union of Operating Eng'rs-Emps. Const. Indus. Ret. Plan*, 728 F.3d 1134, 1140 (9th Cir. 2013) (internal quotations and citations omitted). I review this case based on the administrative record. *Kearney v. Standard*

---

[1] In cases where a plan administrator has a conflict of interest, the abuse of discretion review is "tempered by skepticism." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 707 (9th Cir. 2012). This case does not involve a conflict of interest (and the parties do not argue it does), so this adjusted standard does not apply.

*Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) ("If a court reviews the administrator's decision, . . . the record that was before the administrator furnishes the primary basis for review.").

## ANALYSIS

### I. Interpretation of the Plan and the Waivers

The Trustees denied Smirk's appeal for two primary reasons. First, they determined that Smirk was never entitled to benefits because he never stopped working, as is required to be "retired." Second, they concluded that the waiver's plain terms (namely "consultant/ing") exclude a chief executive officer of an organization, and that any ambiguities in the waiver should be construed against Smirk because he is the one who submitted them. Smirk argues that the Trustees cannot fairly say he did not "retire" because they approved his retirement. Further, he contends that he should not be penalized for following the waiver process and that the words "representative" and "employed" in the waivers encompass his role as BMST.[2]

The Plan defines "retired" as "a separation from Industry Service that is expected to be permanent." ECF No. 31-2 at 115. Smirk was re-elected for a four-year term as BMST just days before applying for his pension benefits, and there is no indication that he ever stopped working. *Id.* at 140; ECF No. 31-1 at 19. He therefore neither separated from service nor stopped work with the expectation that it be permanent. Smirk contends that he "retired" when his application was approved and then "quickly resumed." ECF No. 36 at 4. But he cannot resume what he did not stop doing. Smirk's appeal to the Trustees acknowledges that he "continued work as

---

[2] When Smirk submitted one of his forms for benefits to the pension analyst, he wrote in the email: "As discussed, I do not want my name published in the journal[.]" ECF No. 31-1 at 88. The Trustees asserted in their appeal denial that Smirk did this to conceal his pension benefits. Smirk contends that this was a "well-known and accepted practice" for retirees continuing to work under a waiver and that the Trustees knew of his position so this fact should be of no consequence. ECF No. 31-3 at 1. I need not address this dispute because I can resolve this case regardless of Smirk's intent.

7

[BMST] in 2014 when he applied for his pension." ECF No. 31-3 at 3.  Therefore, the Trustees' conclusion that Smirk was not "retired" is not only a reasonable interpretation of the Plan but is also consistent with the Plan's plain language.[3]

The Trustees bolster their interpretation by pointing to an IRS Private Letter Ruling that concludes an employee is not retired if "both employer and employee know at the time of 'retirement' that the employee will, with reasonable certainty, continue to perform services for the employer." ECF No. 31-2 at 115 (citing I.R.S. P.L.R. 201147038, at 6).  The Private Letter states that a plan will be disqualified under § 1.401(a) if an employee "retires" in violation of this rule. I.R.S. P.L.R. 201147038, at 6.  Although the Private Letter states that it applies to the taxpayer that requested the ruling and that "it may not be used or cited by others as precedent," the Plan requires the Trustees to construe it to "maintain qualified status under the [Internal Revenue Code]." *Id.*; ECF No. 33 at 11.  It is reasonable for the Trustees to rely on the IRS's interpretation of "retired" to prevent disqualification.  The Private Letter's reasoning is consistent with the Trustees' interpretation of the Plan terms as they existed in 2014 when Smirk submitted his application.[4]  The Trustees have discretion to interpret and administer the Plan and I cannot disturb a decision that is reasonable. *Salomaa*, 642 F.3d at 675 (quoting *Conkright*, 559 U.S. at 521).  The Trustees reasonably interpreted the definition of "retired," and did so

---

[3] Concluding that Smirk was not "retired" is also consistent with the Plan's early retirement provision that states: "To be considered retired and be entitled to payment for a month, a Participant may not be employed . . . with any labor organization or any of its affiliated entities[.]" ECF No. 33 at 55.  Smirk was employed in a labor organization as he was BMST of IUPAT District Council 15.  The Trustees, however, did not rely on this specific provision to determine that Smirk did not "retire" when issuing their determination.

[4] References to this Private Letter do not appear in any Plan materials until it was published in the "Summary of Material Modification for 2016" Notification. ECF No. 31-4 at 9-10.  But the IRS Private Letter was issued in 2010 so it was in place at the time Smirk received his benefits from 2014 to 2016 and could reasonably be relied on by the Trustees.

8

consistently with the Plan's provisions, so they did not abuse their discretion in determining that Smirk never retired.

Because Smirk never retired, he was never entitled to pension benefits. The waiver that the Trustees adopted for "retirees performing representative consulting services" would therefore not apply to him, as the waivers are for "retirees." ECF Nos. 31-3 at 50 (2014 waiver); 31-2 at 2 (2015 waiver); 31-2 at 19 (2016 waiver); *see also* ECF No. 31-3 at 50 (2015 waiver with the language "retirees employed as consultants").[5]

## II. Recoupment of Overpayments

Smirk acknowledges that the Trustees may interpret the waiver's language and may change their interpretations. But he contends that the Trustees abused their discretion by retroactively changing their interpretation as to Smirk and his right to benefits. He argues that the Trustees made an initial determination that he retired and fell under the waivers when they approved his retirement and provided him with benefits for 22 months while knowing he was employed as BMST. He contends that they then adopted new interpretations and impermissibly applied them retroactively to reclaim the payments.[6] The Trustees argue that the pension analyst mistakenly determined that Smirk could get benefits while still working as BMST and that the Fund Administrator corrected this upon realizing the error. The Trustees contend that correcting this mistake is not an abuse of discretion.

---

[5] I thus need not decide the reasonableness of excluding Smirk's position as BMST from the interpretation of "representative consulting" or "employed as consultants" under the waivers.

[6] Smirk also argued that the Trustees sought the overpayment from him for "retaliatory purposes." ECF No. 30 at 18. This statement is unsupported by the administrative record. Smirk indicates in his reply brief that he suggested retaliation because "there has never been *any* reasonable support" for the Trustees decision, which led him to "believe[] that such decision arose from some retaliation or some other nefarious reason." ECF No. 36 at 8. As there is no evidence of retaliation, I did not consider it.

9

The administrative record does not clearly show who knew what and when. There is some indication that the Trustees may not have realized Smirk was acting as BMST and receiving pension benefits. Smirk stated on his pension benefits application that his "last IUPAT Plan work (or intended last date)" would be on June 30, 2014 for the employer "DC 15." ECF No. 31-1 at 19. There is no indication that he intended to continue his position as BMST. *Id.* IUPAT's counsel reached out on April 1, 2016 to Fund Administrator Corinne Koch, a different Fund Administrator than the one who confirmed Smirk's retirement, to let her know that Smirk was "not entitled to a waiver since he is still working as an elected officer." ECF No. 31-2 at 21. He also noted that they should "discuss the procedure when the staff approves pensions for local officers." *Id.* These communications do not reveal any prior awareness that Smirk had been both working as BMST and earning his pension benefits.

On the other hand, there is evidence that the Trustees had some idea of what was going on. Fund Administrator Daniel Williams, acting "[o]n behalf of the Board of Trustees," approved Smirk's pension benefits application on August 6, 2014. *Id.* at 31-1 at 36. There is correspondence showing some of the Trustees and the Plan Administrator interacted with Smirk in his capacity as BMST both before and after his "retirement." *See e.g.*, ECF Nos. ECF No. 31-1 at 17 (a June 2014 memo by General Vice President (GVP) James Reid recommending approval of an unrelated waiver that Smirk submitted as BMST); 31-3 at 50 (an April 2015 letter from Fund Administrator Corinne Koch with courtesy copies to GVP Reid and the Co-Chairmen indicating the Trustees' approval of a waiver Smirk had submitted as BMST); 31-2 at 90 (a January 2016 memo by GVP Mark Van Zevern recommending the 2016 waivers submitted by Smirk in his capacity as BMST). There is also the handwritten, unsigned, and undated note written by an IUPAT pension analyst across Smirk's pension benefits application that says,

10

"working under waiver DC15." ECF No. 31-1 at 19.  These facts suggest that the Trustees knew at some level—in the very least through the pension analyst's knowledge as an agent—that Smirk was working as BMST when they approved his retirement.

But this does not mean the Trustees would be acting unreasonably by later determining that this approval was made in error under the Plan's terms.  ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1).  This is meant to "protect the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan." *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 956 (9th Cir. 2014) (internal quotations and citations omitted).  Further, "fiduciaries of a defined benefit pension plan have a duty to protect the pooled funds and distribute benefits only to those who qualify." *Estate of Barton v. ADT Sec. Servs. Pension Plan*, 820 F.3d 1060, 1069 (9th Cir. 2016).  If the Trustees were not allowed to reasonably correct interpretations that were inconsistent with the Plan, they would violate these principles.

In similar cases, courts found no abuse of discretion where plan fiduciaries corrected an employee's action.  For example, in *Phillips v. Brink's Co.*, the district court considered a case where employees had not been applying an "off-set" to disability benefits, which resulted in overpaying union benefits to several participants. 632 F. Supp. 2d 563, 568 (W.D. Va. 2009).  After the miscalculation was discovered, the employees who were overpaid had their benefits reduced to recoup the overpayment.  The plaintiff argued that the employees' application of the off-set was correct under the plan's terms while the defendants argued that the plan dictated a different method. *Id*.  The court held that the plan's terms were ambiguous and that the defendants' interpretation was not an abuse of discretion because it was reasonable. *Id*. at 570.

11

*See also Richardson v. IBEW Pac. Coast Pension Fund*, No. C19-0772JLR, 2020 WL 3639625, at *2-3 (W.D. Wash. July 6, 2020) (holding that the trustees did not abuse their discretion when a participant's benefits were reduced from an actuarial adjustment that had not been initially performed); *Kapp v. Sedgwick CMS*, No. 3:11-CV-393, 2013 WL 26051, at *2-3 (S.D. Ohio Jan. 2, 2013) (holding that the administrator did not abuse his discretion in seeking to recoup mistaken overpayments as the plan allowed for mistaken overpayments to be recouped).

The Trustees acted consistently with the Plan provisions in seeking recoupment of the benefits paid to Smirk. The Plan allows the Trustees to recoup overpayments based on later determinations: "If benefits were paid for a month for which benefits were later determined to be suspended, the overpayment shall be recoverable[.]" ECF No. 33 at 60-61. Even if the Trustees approved Smirk's retirement knowing he would continue his role as BMST, the Plan allows the Trustees to "later determine[]" that benefits should not have been paid out. Here, IUPAT's counsel discovered that Smirk was receiving benefits while working full-time as the BMST and alerted the Fund Administrator to it on April 1, 2016. ECF No. 31-2 at 21. The Fund Administrator promptly suspended Smirk's benefits on April 15 and indicated that the Fund can recover benefits paid to him. *Id.* at 30. In response to Smirk's appeal, the Trustees determined that Smirk did not satisfy the definition of "retired" under the Plan and was therefore not entitled to benefits. None of these facts suggests that the Trustees engaged in decision-making that "clearly conflicts with the plain language of the Plan" or "render[s] nugatory other provisions." *Tapley*, 728 F.3d at 1140.

Rather, it is the Trustees' initial decision to allow Smirk to receive pension benefits while never stopping his elected position that "clearly conflicts with the plain language of the Plan." *Id.* As discussed above, Smirk never separated from his work in Industry Service because he

12

continued to serve as the BMST. ECF Nos. 31-3 at 3; 33 at 111.  He also could not have "expected" his alleged separation to be "permanent" if he was re-elected to the role ten days before and continued to serve in that same role. ECF Nos. 31-2 at 140; 33 at 111.  Smirk has not proposed any other interpretation of the Plan's definition of "retired" that would entitle him to benefits and I do not see how he could.  Interpreting the language that a separation is "expected to be permanent" to apply to a person that never stopped working in a role with a four-year term would render the phrase "nugatory." *Tapley*, 728 F.3d at 1140.  Further, Section 7.17 of the Plan titled "Retirement and Suspension of Benefits Before Normal Retirement Age" states that a Participant is not "considered retired" if he is employed "with any labor organization or any of its affiliated entities[.]" ECF No. 33 at 55.  A determination that Smirk was retired therefore contradicts two separate provisions of the Plan.

If the Trustees' version of events is correct and this was just a mistake by a lower-level employee about which they had no knowledge, then the Trustees did not abuse their discretion in correcting the error based on the Plan's definition of "retired."  If Smirk's version of events is correct and the Trustees knowingly interpreted the Plan and the waivers to include Smirk's situation, then the Trustees still acted reasonably in changing their initially unreasonable interpretation to one that comports with the Plan.  I recognize why Smirk may find this situation unfair.  However, it cannot be the case that the Trustees abused their discretion solely because they reinterpreted the Plan's terms reasonably after previously making an unreasonable interpretation. The Trustees' interpretation of "retired" is both reasonable and consistent with the Plan's plain language.  The Plan allows them to seek recoupment and they acted reasonably, and within their discretion, in doing so.

/ / / /

13

### III. Waiver and Estoppel

Smirk argues that the doctrines of waiver and estoppel prevent the Trustees from recouping the pension benefits from him. He contends that the Ninth Circuit allows for the waiver doctrine in ERISA cases and that it should apply to the Trustees because they treated him as if he had retired and fell under the waivers with full knowledge of his role as BMST. In a similar vein, Smirk argues that the Trustees should be estopped from recouping the overpayment because he detrimentally relied on their decision by continuing to act as BMST with the understanding he would still receive his pension benefits. The Trustees respond that waiver and estoppel should not apply where fiduciaries are owed deference in their decisions because it would strip them of their deference. They argue that they have a duty to correct mistakes and that applying the doctrines would force them into a "Hobson's Choice."

A waiver occurs when a party "'intentionally relinquishes a right' or 'when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.'" *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 938 (9th Cir. 2017) (quoting *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991)). The Ninth Circuit has suggested that in ERISA cases, detrimental reliance may also be required to prove waiver. *Id.* at 941 n.5.

It is unclear whether the waiver doctrine applies in an abuse of discretion case. In *Salyers*, the Ninth Circuit applied the waiver doctrine in the context of an insurer denying benefits under a life insurance policy obtained through an ERISA-governed benefits plan. *Id.* at 938. But, as the Trustees point out, that case did not involve a circumstance where deference was afforded to a fiduciary. Applying the waiver doctrine in this context might interfere with the abuse of discretion standard. The *Salyers* court also noted district court decisions that have

prevented application of the waiver doctrine when it "create[s] coverage beyond that actually provided by an employee benefit plan." *Id.* at 941 n.4 (explaining that the limitation did not apply to the waiver at issue because applying it did not expand the scope of the ERISA plan).

Similarly, estoppel is meant to hold a fiduciary to "what it had promised" and puts the person in "the same position he would have been in had the representations been true." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011) (internal citation and quotation omitted). Estoppel requires a showing that:

> (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Gabriel*, 773 F.3d at 955 (quoting *Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir. 1992)). In the ERISA context, the Ninth Circuit has required additional threshold elements to be met beyond the traditional requirements for estoppel. The plaintiff must show that (a) "extraordinary circumstances" are present, (b) the plan's provisions are ambiguous, and (c) the representations about the plan must be "an interpretation of the plan" rather than an amendment, modification, or mistaken assessment of benefits. *Id.* at 957, 959. The latter two elements ensure that "a party cannot maintain a federal equitable estoppel claim in the ERISA context when recovery on the claim would contradict written plan provisions." *Id.* at 956.

Here, waiver and estoppel do not bar the Trustees from recouping the overpayments. A participant is not entitled to pension benefits if he has not retired, and Smirk never retired. If the Trustees were blocked from recouping the benefits, Smirk would receive pension benefits he was not entitled to by the Plan's plain terms. Assuming without deciding that the waiver doctrine would apply to an abuse of discretion case, it is nevertheless inapplicable here because it would "expand" Smirk's right to benefits "beyond what is provided under the clear terms of the Plan."

*Salyers*, 871 F.3d at 941 n.4; *see also Flynn v. Sun Life Assur. Co. of Can.*, 809 F. Supp. 2d 1175, 1187 (C.D. Cal. 2011); *Yale v. Sun Life Assur. Co. of Can.*, No. 1:12-cv-01429-AWI-SAB, 2013 WL 5923073, at *13 (E.D. Cal. Oct. 31, 2013). Similarly, the estoppel doctrine cannot apply because it would confer benefits that contradict written Plan provisions. *See Gabriel*, 773 F.3d at 956. Because waiver and estoppel do not apply, I will not disturb the Trustees' reasonable denial of Smirk's appeal.

Even if all the threshold elements for waiver and estoppel were met, there is no evidence of detrimental reliance. Nothing in the administrative record indicates that Smirk used these funds or otherwise was harmed in reasonable reliance on the Trustees' actions. Smirk claims in his brief that "there is no dispute" that he "did detrimentally rely on the Plan, the waiver of suspension of benefits provision, and the granting of such waiver after Smirk applied for such waiver." ECF No. 30 at 15. He asserts that he "maintained his employment with UIPTA [sic] in reliance" and that "he was not otherwise planning on working for free for 22 months." *Id.*; ECF No. 36 at 14. But Smirk was not "working for free" during this time because he had been "employed" and paid as the BMST. The administrative record suggests he was making $55,630.80 in wages in 2017, which is when he was acting as BMST but no longer receiving pension benefits. ECF No. 31-3 at 73. Smirk may have meant he would have otherwise ceased working if he would not also receive his pension benefits, but again this assertion is not supported by the administrative record. He has not pointed to anything in the administrative record where he indicated he would abdicate his BMST role if he could not simultaneously receive pension benefits. To the contrary, Smirk has continued his role as BMST despite the suspension of his pension benefits in 2016. ECF No. 2 at 3 (explaining that he was most recently re-elected to BMST in June 2018 for a term that runs through June 2022). Detrimental reliance

16

is a required element of estoppel and the Ninth Circuit has suggested it may also be one for waiver. *Gabriel*, 773 F.3d at 955; *Salyers*, 871 F.3d at 941 n.5.  Even assuming estoppel or waiver could apply when it would enlarge someone's benefits beyond the Plan's terms, Smirk has not established detrimental reliance.

**CONCLUSION**

I THEREFORE ORDER that the defendants' denial of plaintiff John Smirk's claims for pension benefits is affirmed.  The clerk of the court shall enter judgment in favor of the defendants and against the plaintiff.

DATED this 12th day of November, 2020.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE